## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **RAY STEVEN SAPP**, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **v.** | ) | **6:12-cv-2896-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration**, | ) | |
| | ) | |
| **Defendant**. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 4, 2009, the claimant, Ray Stevens, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act. (R. 22)  The claimant also filed a Title XVI application for supplemental security income on February 4, 2009. (R. 22)  He alleges disability commencing on February 1, 2005, because of mild chronic obstructive pulmonary disease, polysubstance abuse, depression, chest and lower stomach pain, hand pain, angina, and artery blockage. (R. 24-27).

The Commissioner denied the claim initially on May 14, 2009. (R. 67). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on September 23, 2010. (R. 43).  In a decision dated November 15, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, ineligible for disability insurance benefits. (R. 1). On July 9, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the

Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents three issues for review: (1) whether the ALJ erred in giving Dr. Blotcky's opinion little weight and determining that the claimant's depression did not qualify as severe impairment or meet a listing; (2) whether the ALJ properly evaluated the claimant's subjective testimony regarding his breathing and hand movement limitations in the hypothetical posed to the vocational expert; and (3) whether the ALJ committed reversible error by failing to specifically instruct the consulting physician, Dr. Harrison, to x-ray the claimant's hands.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In determining whether the claimant possesses a severe impairment, the Commissioner must consider whether the impairment significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.920(c); *see also* 20 C.F.R. §

404.921(a); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Basic work activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b). A non-severe impairment is one so slight and minimal in effect that it would not be expected to interfere with an individual's work activities, regardless of the individual's particular circumstances. *McDaniel*, 800 F.2d at 1031; *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).

The ALJ must state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and substantial evidence supports those reasons, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

The ultimate issue of disability is left to the determination of the Social Security Commissioner, and the statement by a medical source that a claimant is "disabled' is not binding. 20 C.F R. § 404.1527 (e). Although the ALJ must give substantial weight to the medical opinion

of a claimant's treating physician, she is not forced to base her conclusion on a physician or

outside entity's determination of disability. *Symonds v. Astrue*, 448 F. App'x 10, 12 (11th Cir.

2011). If her reasons are supported by substantial evidence, the ALJ commits no reversible error.

*Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005)

      The Global Assessment Functioning Score (GAF) is a subjective determination that

represents the clinician's judgment of the individual's overall level of functioning. *Wesley v.*

*Comm'r of Soc. Sec.,* No. 99-1226, 2000 WL191664, at *3 (6th Cir. 2000). An assessment of a

GAF score of 50 or below can indicate serious mental impairments in functioning. *McCloud v.*

*Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (citing the American Psychiatric Association,

Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994)). For any GAF score in

the medical record revealing possible serious mental impairments, the ALJ should determine

what weight, if any, to give that particular score.  *Id*.  However, the  GAF scale "'does not have a

direct correlation to the severity requirements in [the] mental disorders listings.'" *Nye v. Comm'r*

*of Soc. Sec*., 2013 WL 3869964 (11th Cir. July 26, 2013).  Therefore, the ALJ is not required to

rely on a GAF score in making her ultimate disability determination. *Luterman v. Comm'r of Soc.*

*Sec.*, 518 F. App'x 683, 690 (11th Cir. 2013).

      The ALJ commits reversible error if she exercises her discretion not only to make a

determination of disability but also to disregard medical evidence in favor of her own

impressions.  "An ALJ...abuses his discretion when he substitutes his own uninformed medical

evaluations for those of a claimant's treating physicians." *Marybury v. Sullivan*, 957 F.2d 837,

840 (11th Cir. 1991) (J. Johnson concurring).

      For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose

a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm'r of Soc. Sec.*, 265 F. 3d 1224, 1229 (11th Cir. 2001). An ALJ is not required to include claims that have been properly discredited in the hypothetical posed to the vocational expert. *Turner v. Comm'r of Soc. Sec.*, 182 F. App'x 946 (11th Cir. 2006).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529. Subjective testimony can satisfy the pain standard if it is supported by medical evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). If the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Id.* A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Foote*, 67 F.3d at 1562.

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

Her duty to fully develop the record "requires the ALJ to order a consultative evaluation when such an evaluation is necessary to make an informed decision." *Smith v. Comm'r of Soc. Sec.*, 501 F. App'x 875, 878 (11th Cir. 2012). An ALJ may not assume the authority to act as both judge and physician. *Marbury v. Sullivan*, 957 F. 2d 837, 840-841 (11th Cir. 1991).

6

## V. FACTS

The claimant has an 8th grade education and was forty-two years old at the time of the administrative hearing. (R. 121) His past work experience involved working as a truck driver, saw operator, and band saw operator. (R. 56). The claimant alleged that he could not work because of mild chronic obstructive pulmonary disease, polysubstance abuse, depression, chest and lower stomach pain, hand pain, angina, and artery blockage. Though the claimant alleges disability beginning in 2005, the record provides no medical evidence concerning the allegedly disabling symptoms until 2009.

*Physical Limitations*

On March 4, 2009, the claimant reported in his Social Security Function Report that on a typical day he woke up, ate breakfast, drank coffee, and watched TV. He reported that he was unable to do anything because of the pain in his hands, but that his breathing was the bigger problem. He also indicated that he had trouble putting on socks and shoes because of pain in his hands. (R. 132).  He reported that he needed reminders to take his medicine and cooked frozen dinners daily. He indicated that he made the bed, but could not do house or yard work because of pain in his hands. (R. 135).

The claimant reported that he did not drive because his hands bothered him but he did shop for groceries about twice a month for more than an hour at a time. He reported that his only hobby was watching TV. He indicated that the only thing he was able to do was watching TV. (R. 136).  The claimant reported that he could not lift more than 7 pounds because of his breathing and pain in his hands. He indicated that he could walk about 50 yards but then would need a break. (R. 137). The claimant clarified that he had trouble breathing while walking and

7

could not talk for 5 to 10 minutes without running out of breath. (R. 140).

On March 20, 2009, Dr. Boyde Harrison consultatively examined the claimant at the request of the Social Security Administration. The claimant reported to Dr. Harrison that he applied for disability because he could not grip with his hands and became short of breath with exertion. The claimant reported to Dr. Harrison that he experienced chest pain and pain in his left lower abdomen when lifting. Dr. Harrison reported that the claimant stated that he took no medications. Dr. Harrison also reported that the claimant did experience very mild scattered wheezes. (R. 163). He reported that the claimant had normal range of motion in his wrists and his grip strength was a 5/5.  Dr. Harrison opined that the claimant had very mild COPD and that, although the claimant complained of pain in his hands, his grip strength and range of movement were normal. (R. 164).

On June 3, 2010, the claimant reported to Dr. Foster Jones at Capstone Rural Health Center that he experienced chest pain and shortness of breath. Dr. Jones reported that the claimant's oxygen reading was 98%. Dr. Jones reported telling the claimant that he needed a chest x-ray and discussing charity care applications for the procedure because the claimant could not pay for the x-ray. The Capstone Rural Health Clinic never performed a chest x-ray on the claimant. (R. 181).

On June 6, 2010, Dr. Laura Hughes admitted the claimant into UAB Hospital with unstable angina. Dr. Hughes reported that the claimant smoked half a pack of cigarettes a day, drinks occasionally, and smokes marijuana occasionally. The claimant told Dr. Hughes that he took Celexa and Ibuprofen. Dr. Hughes ordered an EKG and chest x-ray for the claimant. Both the EKG and x-ray indicated normal function.  The claimant's pulmonary functioning showed a

FEV1 of 3.03 or 89% as predicted. Dr. Hughes prescribed Lovenox and Plavix for the claimant's

chest pain and hyperlipidemia. Dr. Hughes discharged the patient from UAB the next day. (R.

197).

*Mental Limitations*

On May 20, 2010, Dr. Jones at the Capstone Rural Health Center examined the claimant.

The claimant complained of feeling depressed for two weeks with a sense of hopelessness. Dr.

Jones opined that the claimant suffered from seasonal pattern depression. Dr. Jones prescribed 20

mg of Celexa for the claimant's depression. (R. 182-183).

On September 13, 2010, Dr. Alan Blotcky, a clinical psychologist, examined the claimant

at the request of his attorney. The claimant reported to Dr. Blotcky issues with angina,

hypertension, pain in both hands, and depression. Dr. Blotcky reported that the claimant had been

dealing with depression for more than four years and that his family physician had prescribed

him Celexa in June of 2010. Dr. Blotcky indicated that the claimant reported that he had

threatened to kill himself with a gun in August of 2010. (R. 186).

Dr. Blotcky reported that the claimant admitted to abusing marijuana and smoking 3

joints per week. The claimant told Dr. Blotcky that he spent most of his time resting and

watching television, and that he did no housework or cooking. (R. 186).

Dr. Blotcky reported that the claimant was appropriately attired but disheveled in

appearance. He reported that the claimant looked tired and cried during the session. He said that

the claimant seemed very depressed to him. Dr. Blotcky reported that the claimant had an IQ of

80 and a 42 on the Beck Depression Inventory, indicating the presence of severe depression. Dr.

Blotcky also reported that the claimant had a GAF of 44. (R. 188).

Dr. Blotcky also reported that the claimant had marked difficulty responding appropriately to supervisors, responding appropriately to customers or other members of the general public, and dealing with changes in a routine work setting. He also reported that the claimant likely experienced marked difficulty maintaining attention, social functioning, or maintaining activities of daily living. He opined that the claimant had moderate difficulty understanding simply instructions, remembering complex instructions, responding appropriately to co-workers, using judgment in simple or detailed decisions. (R. 189-190).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on September 23, 2010. (R. 43). The ALJ first asked the claimant when he last smoked marijuana. The claimant responded that he last smoked marijuana two years ago. The ALJ then asked the claimant how much tobacco and alcohol he used. The claimant responded that he smoked a pack and a half a day and occasionally drinks beer, but no longer drinks heavily. The claimant said that he drank a beer two months ago. The ALJ then asked the claimant about his public intoxication arrest in 2007. The claimant said that he was arrested and pled guilty but never placed on probation. (R. 46).

The ALJ then asked the claimant why he could not work. The claimant responded that he tried to do things around the house but was not able to push, pull, or pick anything up. The claimant indicated that he experienced pain in his chest, stomach, and hands. He also stated that he experienced dizziness and shortness of breath. The claimant stated that doctors said angina and early chronic pulmonary obstruction disease (COPD) caused the symptoms. The ALJ asked if those doctors told the claimant his smoking could be causing the symptoms. The claimant said

10

that the doctors told him to stop smoking but did not attribute the symptoms to smoking. (R. 47)

The ALJ then asked the claimant about an EKG performed on June 6, 2010. The claimant said hospital staff could not find him at first for the EKG because he was outside smoking after being admitted to the hospital. The claimant reported that the EKG was rescheduled. The claimant continued that doctors were concerned about his blood pressure and that he now takes blood pressure pills. (R. 47).

The claimant testified that he was last employed as a truck driver. He said that he worked as a driver for about 8 months but stopped because of worsening health. He also testified that he caught himself pulling out in front of things and having difficulty keeping logs. The ALJ asked when he stopped working, and the claimant responded that he stopped in 2005 or 2006. The ALJ pointed out that the claimant received his CDL in January of 2006. The claimant then replied that he may have stopped working at the end of 2006. (R. 48).

The ALJ asked the claimant for whom he worked as a truck driver. The claimant responded that he drove a truck for Panther but drove a truck that another man owned. The claimant testified that the truck owner paid him, not Panther. The claimant testified that his check was tax-free. The ALJ then explained to the claimant that disability benefits are available to applicants who have paid premiums into Social Security for 20 of the last 40 quarters of work. (R. 49).

The ALJ then asked the claimant about his work experience at Coastal Human Resources Group. The claimant testified that he was employed with them for about a month after Hurricane Katrina. The ALJ also noted some self-employment income in 2004 and employment at the Newberg Road Lumber Company in 2003. The claimant testified that he worked at the lumber

company for 15 years and then sporadically for 4 or 5 more years. He testified that he saw-milled, drove a forklift, ran a table saw, and operated a band saw while employed there. The claimant continued that he left the lumber company for more money and dislike for his boss. (R. 49-50).

The ALJ then asked the claimant if he knew who took over the Newberg Company. The claimant said that the company was going out of business. The ALJ then asked the claimant if he had tried to work at another saw mill. The claimant responded that he could not work at a sawmill because of the pain he experienced. He continued that the pain worsened when he tried to do anything. The claimant testified that he wanted to be able to work but could not. (R. 50).

The ALJ then asked the claimant about his home life. The claimant testified that he lived with his wife and they had two children. He continued that neither of his two children lived at home. The claimant testified that his wife did the housework, cooking, and cleaning. He stated that his wife had to do a little at a time because of foot problems. The ALJ asked the claimant if his wife was a smoker. The claimant said no. The ALJ then asked the claimant how he bought cigarettes to smoke. The claimant reported that he bummed cigarettes from others or his wife bought him cigarettes with her disability check. (R. 51).

The ALJ asked the claimant if he had tried the Alabama Tobacco Quit Line. The claimant responded that UAB gave him paperwork for it but he had not called them. He also reported that his sister told him about a place to get free nicotine patches. (R. 52).

The claimant's attorney then asked him if he was depressed. The claimant reported that he was depressed and threatened suicide on September 13, 2010. He testified that he had grown more depressed because he could not work. The claimant stated that the Capstone Rural Health Clinic prescribed Celexa for his depression. He reported that the medication helped. (R. 52-53).

The claimant's attorney asked him if he experienced any swelling or pain. The claimant responded that he only experienced pain. He reported that the doctor to whom Social Security sent him looked at his hands but did not perform x-rays. The claimant continued that he experienced a 7 on a 10-point pain scale in his hands, but the pain increased to a 10 or 11 if he pushed or pulled. The ALJ asked him if he had ever been to the emergency room for the pain, and the claimant said no. The claimant stated that he rubbed and shook his hands for relief and took Excedrin and Ibuprofen. (R. 53-54).

The claimant then reported that his blood pressure had reached 155/90 or 160/90 and that he took 50 mg of blood pressure medicine a day. (R. 54).  The claimant then stated the he does not drive anymore. He testified that he mentally did not feel comfortable driving a car. He also testified that he could no longer drive a truck because of both mental and physical impairments. The claimant stated that he hurt getting in and out of the truck or securing a load. (R. 54-55).

The claimant's attorney asked him if he experienced any back pain. The claimant said he experienced mainly chest and hand pain. He stated that his chest pain is constant but worsened by exertion. He then testified that he could stand for 20 to 30 minutes and that sitting that long made him uncomfortable. He continued that he walked to the mailbox sometimes but that was as far as he went. (R. 55).

The claimant reported that he tried to help his wife with housework but could not do much. He stated that his neighbor's son mowed the lawn and that he spent most of the day watching TV. He continued that if someone came to see him, he would go outside to the picnic table. He also stated that he spent hardly any time during the day laying down. The claimant testified that he spent most of the time sitting and getting up occasionally. He also testified that

he occasionally went for a walk with his wife, but always avoided picking up any weight. The claimant stated that he did not take out the garbage. (R. 56).

The ALJ then began asking the vocational expert, Thomas Elliott, about the claimant's experience. The ALJ asked Mr. Elliott to classify the claimant's past relevant work. Mr. Elliott reported that the saw work was unskilled, medium exertion level; the band saw work was unskilled, light exertion level; and truck driving was semi-skilled, medium exertion level. He continued that truck driving skills are not transferable to light or sedentary work. (R. 56-57).

The ALJ then posed a hypothetical to Mr. Elliott to assess an individual with the following limitations: has the claimant's education, training, and work experience; is limited to a light range of work; and must avoid concentrated exposure to fumes, odors, dust, and gas environments with poor ventilation. The ALJ asked Mr. Elliott if such a person would be able to do the claimant's past relevant work. Mr. Elliott reported that the light level requirement would preclude truck driving, and that the need to avoid sawdust would preclude saw work. (R. 57).

The ALJ then asked Mr. Elliott if the individual in the hypothetical could perform any jobs in the national and regional economy. Mr. Elliott reported that such an individual could work as an assembler of small products, with 3,400 jobs exist regionally and 490,000 nationally; a nut and bolt assembler, with 920 jobs regionally and 31,000 nationally; and a packing line worker, with 950 regionally and 36,000 nationally. (R. 58).

The ALJ then asked Mr. Elliott to assess a second hypothetical, with the same limitations as the first hypothetical, but an additional limitation that the individual could do no more than occasional reading for content, comprehension, and mathematical work. Mr. Elliott testified that the jobs available in the first hypothetical would still be available to the individual in the second

14

hypothetical. (R. 59).

The claimant's attorney then asked Mr. Elliott if limited use of his hands would impact the hypothetical situations. Mr. Elliott reported that the limitation would preclude the work. The attorney then asked Mr. Elliott if the RFC from Dr. Blotcky would preclude any jobs in the hypothetical. Mr. Elliott reported that the items indicated as severe in Dr. Blotcky's report would preclude all gainful employment. (R. 60).

The claimant's attorney asked Mr. Elliott if the jobs available in the hypothetical involved lifting. Mr. Elliott reported that the jobs required lifting no more than 10 pounds. Mr. Elliott said that all three jobs involved lifting up to 10 pounds on a frequent basis and 20 pounds occasionally.

When asked about absenteeism, Mr. Elliott reported that missing more than two days a month on a consistent basis precluded the ability to maintain any employment. Mr. Elliott then reported that persistent moderately severe pain, at a 7 out of 10 level, interfered with the ability to maintain concentration, persistence, or attention and precluded all work. (R. 61).

*The ALJ's Decision*

On November 15, 2010, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 31). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (R. 24 ). Next, the ALJ found that the claimant's mild chronic obstructive pulmonary disease (COPD) and polysubstance abuse did constitute severe impairments; she concluded, however, that the claimant's impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. The ALJ found the claimant's

depression did not constitute a severe impairment. The ALJ noted that the claimant cooked, shopped, did chores, watched TV, and had no problem getting along with others. The ALJ also noted evidence of one episode of decompensation but no marked limitations. (R. 26).

The ALJ determined that the claimant's hand pain did not constitute a severe impairment. The ALJ noted that though the claimant complained of hand pain, Dr. Harrison specifically reported that the claimant exhibited normal range of motion in his hands and his grip strength was normal. (R. 25).

The ALJ determined that the claimant's mental impairment did not meet or medically equal the criteria of a listing. The ALJ concluded that the claimant's depression did not cause two marked limitations or one marked limitation and repeated episodes of decompensation. The ALJ noted that the claimant reported difficulty completing tasks, concentrating, and understanding, but noted that the claimant said the difficulties were because of his physical conditions. The ALJ noted that no doctor detected difficulty understanding or answering questions. The ALJ determined that the claimant's seasonal depression resulted in no more than mild restriction in daily living, moderate difficulty in social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. (R. 26).

The ALJ next determined that the claimant had the residual functional capacity to perform light work that avoided concentrated fumes, gas, dust, or poor ventilation and was limited to unskilled occupations requiring no more than occasional reading for content or comprehension. The ALJ noted that she considered all symptoms and the extent that the symptoms could be accepted as consistent with objective medical evidence. (R. 26).

The ALJ then applied the Eleventh Circuit's pain standard in assessing the claimant's

16

COPD, hand pain, and depression. The ALJ noted that the claimant testified that he had chest and lower stomach pain, hand pain, dizziness, shortness of breath, early COPD, angina, high blood pressure, and depression. The ALJ noted that the claimant testified that he could not work because of pain in his hands, that he estimated to be at a 7/10 pain on the day of the hearing. The ALJ noted that the claimant testified that he takes Ibuprofen for pain relief and medication for depression, which seems to help. (R. 27).

The ALJ found that the claimant's medically determinable impairments could reasonably be expected to case the alleged symptoms. However, the ALJ found the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms not credible to the extent that they are inconsistent with the ALJ's residual functional capacity assessment. The ALJ noted that the claimant had not sought any medical treatment for any impairment at the time he filed his application. The ALJ determined that the claimant's lack of seeking medical treatment suggested that the impairments were not especially troublesome and found the lack of seeking medical treatment consistent with Dr. Harrison's report. (R. 27).

In assessing the claimant's allegations of hand pain, the ALJ noted that, although the claimant alleged that Dr. Harrison "looked at my hand and said, huh, that's all he done," Dr. Harrison specifically noted that even though the claimant complained of pain in his hands, his grip strength and range of motion were normal. The ALJ also noted that the Capstone Rural Health Clinic noted that the claimant suffered from "arthralgias," but did not recommend any diagnostic testing and prescribed Ibuprofen. Finally, the ALJ noted that the claimant did not complain of hand pain when he was hospitalized in June of 2010. (R. 27).

Regarding the claimant's allegations of chest pain, the ALJ noted all cardiac testing had

17

been negative and that the claimant's pulmonary functioning showed mild COPD with a FEV1 of 3.03 or 89% as predicted. The ALJ also noted that when the claimant was hospitalized with complaints of chest pain in June of 2010, no wheeze was present, his blood oxygen level was 98% and the claimant denied shortness of breath. The ALJ noted that reports from the Capstone Clinic also indicated that the cardiac stress test was negative and his examinations were unremarkable. (R. 27-28).

The ALJ next considered the claimant's depression. The ALJ noted that the claimant reported that he suffered only from physical impairments when he filed for disability. The ALJ also noted that the claimant never sought any mental health treatment. The ALJ continued that the claimant began medication for depression in June of 2010 and reported that the medication helped his symptoms. The ALJ also noted that clinic notes only report seasonal depression and do not include specific symptoms or suggest psychological counseling. (R. 28).

The ALJ next discussed Dr. Blotcky's report. The ALJ noted that the claimant visited Dr. Blotcky at the request of his attorney. The ALJ noted that Dr. Blotcky opined that the claimant was suffering from depressive disorder, marijuana abuse, and alcohol abuse. The ALJ also noted that Dr. Blotcky assessed the claimant's GAF as a 44. The ALJ found the GAF to be inconsistent with both Dr. Blotcky's report and the medical evidence as a whole. The ALJ noted that a GAF of 44 was inconsistent with Dr. Blotcky's report that the claimant demonstrated logical and orderly thinking, normal speech, adequate abstract thinking, and accurate memory function. The ALJ also noted that the treatment records consistently report that the claimant was alert and oriented, well developed, and in no acute distress. The ALJ noted that the hospital records reflect an intact psychiatric exam. The ALJ concluded that the medical evidence in the record did not

18

support Dr. Blotcky's diagnosis. (R. 28).

The ALJ then discussed the credibility of the claimant. The ALJ noted that the claimant had a history of drug and alcohol abuse, but the drug and alcohol abuse was not relevant because the claimant would not otherwise be disabled with or without the abuse. (R. 28).

The ALJ noted inconsistencies in the record regarding the claimant's statements. The ALJ noted that the claimant told Dr. Harrison that he had been alcohol free for 3 years, but told the medical staff at UAB that he drank every once in a while. Also, the ALJ pointed out that the claimant testified at the hearing that he still drinks occasionally and drank 3 weeks prior to the hearing. (R. 28).

The ALJ also noted that the claimant told his treating physician that he did not use drugs, but admitted to Dr. Blotcky that he usually smoked 3 joints per week. The ALJ noted that the claimant testified at the hearing that he had not used drugs in 2 years. The ALJ also discussed that, although the claimant reports to smoke 1 ½ packs of tobacco daily, he emphatically denied smoking when doctors suggested that he quit. (R. 28).

The ALJ also noted that the claimant testified that he renewed his CDL renewed on January 27, 2006, but claimed that he had to stop driving trucks before that time. The ALJ noted that the claimant reported to Dr. Blotcky that he had no arrest record, but he testified at the hearing that he had several arrests and convictions for drugs and alcohol. The ALJ noted that these inconsistencies call into question the information the claimant told Dr. Blotcky and raise a question of the validity of the findings from the examination. (R. 29).

The ALJ then discussed the weight given to Dr. Blotcky's assessment of the claimant. The ALJ gave little weight to Dr. Blotcky because the claimant underwent the examination not

seeking treatment, but instead as a referral by his attorney to bolster his disability claim. The ALJ noted that such medical evidence was legitimate and deserved due consideration, but the context of the examination could not be ignored. The ALJ also noted that the information came one-sided from the claimant and that Dr. Blotcky provided little explanation of the evidence he relied on in forming his opinion. (R. 29).

The ALJ then determined that the claimant had the residual functional capacity to perform light work, lifting no more than 10 pounds frequently and 20 pounds occasionally. The ALJ also noted that the claimant should avoid concentrated fumes, gas, dust, and poor ventilation and was limited to unskilled occupations requiring no more than occasional reading for content and comprehension. (R. 29).

The ALJ next found that the claimant was unable to perform any past relevant work. The ALJ noted that the vocational expert testified that the claimant's past work as a saw operator was medium and unskilled, band saw operator was light and unskilled; and truck driving was medium and semiskilled. The ALJ noted that the vocational expert testified that the claimant could not return to his previous work with the RFC determined by the ALJ. The ALJ found that the vocational expert's testimony was consistent with the classification of the jobs in the Dictionary of Occupational Titles and that the claimant was unable to perform any past relevant work. (R. 29).

The ALJ noted that the vocational expert took into consideration the claimant's age, education, work experience, and residual functional capacity. The ALJ noted that the vocational expert testified that the claimant could perform the requirements of an assembler of small parts, with 490,000 jobs nationally; nut and bolt packer, with 31,000 jobs nationally; and a packing line

20

worker, with 36,000 jobs nationally. (R. 30). The ALJ found the vocational expert's testimony to be consistent with the record.

The ALJ determined that the claimant could perform work that existed in significant numbers in the national economy. The ALJ concluded that the claimant was not under a disability and, thus, not entitled to disability insurance benefits. (R. 31).

## VI. DISCUSSION

1.  The ALJ correctly weighed Dr. Blotcky's opinion and reasonably determined that the claimant's depression was not a severe impairment.

The claimant argues that the ALJ erred in determining that the claimant's depression did not constitute a severe impairment. The court finds that the ALJ specifically stated the reasons for determining the depression was not a severe impairment, that she explained her reasons, and that substantial evidence supports her decision.

The ALJ must state with particularity the weight given to different medical opinions. Failure to do so is a reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor*, 786 F.2d at 1053.

"In sequential evaluation step two, the Commissioner determines whether a claimant has a 'severe' impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function." *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). "Basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of

judgment; (5) Responding appropriately to supervision, co-workers, and ususal work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

In evaluating the claimant's depression, the ALJ relied on the opinion of Dr. Blocky, the treating psychiatrist. The ALJ gave little weight to Dr. Blotcky's assessment. The ALJ correctly noted that the claimant was untruthful with Dr. Blotcky, resulting in the ALJ's distrust in the truthfulness of the information the claimant gave Dr. Blotcky during the session as a whole. The ALJ noted that the claimant never sought mental health treatment until sent to Dr. Blotcky by his attorney. The ALJ reasoned that the lack of treatment, coupled with the fact that the claimant did not allege depression at the time he filed his application, discounted Dr. Blotcky's opinion of severe mental impairment. The ALJ also gave less weight to Dr. Blotcky's report because of a lack of information, specifically that the report provided very little explanation or evidence. The ALJ recognized that the claimant had a GAF of 44, which is entitled to some weight, but reasonably found very little support for Dr. Blotcky's determination. The medical evidence as a whole did not support the GAF or Dr. Blotcky's findings. This court finds that the ALJ reasonably discounted the medical opinion of Dr. Blotcky and correctly gave his opinion little weight.

In determining if the depression was severe, the ALJ relied on the reports from Capstone Rural Health Clinic indicating that the claimant suffered from seasonal depression. No evidence showed any continued periods of marked difficulty or 2 periods of decompensation. The ALJ reasonably relied on the opinions of treating physicians at the Capstone Clinic diagnosing the claimant with seasonal mild depression and prescribing Celexa. The ALJ also noted that the claimant also testified that the medication was helpful and that his symptoms had improved.

22

The ALJ articulated specific reasons for finding the claimant's depression non-severe. This court finds that the ALJ properly discounted the opinion of Dr. Blotcky and relied on substantial evidence in the record indicating that the claimant's depression did not constitute a severe impairment.

2. The ALJ properly evaluated the claimant's subjective testimony regarding his breathing and hand movement limitations in the hypothetical posed to the vocational expert.

The claimant argues that the ALJ failed to properly address the claimant's limitations in assessing his RFC and posing hypothetical scenarios to the vocational expert, Mr. Elliott. The court finds that the ALJ's hypotheticals addressed the residual functional capacity determined by the ALJ. Substantial medical evidence supports the ALJ's decision to leave the claimant's alleged hand and exertional limitations out of the hypotheticals posed to the vocational expert.

A hypothetical does not need to include complaints that have been properly discredited. *Turner v. Comm'r of Soc. Sec.*, 182 F. App'x 946 (11th Cir. 2006).

The ALJ reasonably discounted the claimant's complaints of painful or limited hand movement. The ALJ discussed that the claimant's allegations of hand limitations contradicted the medical exam by Dr. Harrison in which the claimant exhibited normal range of motion in his wrists and had a 5/5 grip strength.

The ALJ also correctly applied the Eleventh Circuit's pain standard in the assessment of the claimant's hand pain. In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223

(11th Cir. 1991). If the ALJ decides to discredit the claimant's testimony as to his pain, she must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Foote*, 67 F.3d at 1562. The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

The ALJ noted that the claimant's alleged hand pain could reasonably be expected to give rise to the alleged symptoms, but the ALJ found that the claimant's testimony about intensity, persistence, and limitation to be incredible. The ALJ reasonably relied on Dr. Harrison's assessment of the claimant's hand movement and the claimant's Capstone Rural Health Clinic treating physicians' assessments that the claimant did not require anything more than Ibuprofen.

Further, the ALJ reasonably did not include exertional limits that the claimant alleged regarding his early COPD. The ALJ properly noted that the claimant denied shortness of breath at UAB hospital in June 2010 and that his blood oxygen level was 98% during that hospital stay. The ALJ also correctly relied on consistent hospital results showing that the claimant had mild COPD and a FEV1 of 3.03 or 89% predicted. The ALJ again correctly applied the Eleventh Circuit's pain standard in evaluating the claimant's subjective complaint of exertional fatigue. The ALJ found that the claimant's mild COPD could cause the alleged fatigue, but found the claimant's complaints about persistence and intensity contradictory to the medical record as a whole.

The hypotheticals used by the ALJ included all of the claimant's limitations not

24

discredited directly by the ALJ in the decision. The ALJ properly and reasonably discredited the claimant's subjective complaints of hand pain and exertional fatigue, and, thus, her hypotheticals properly evaluated the limitations of the claimant.

3. The ALJ committed no error in ordering a consultative exam by Dr. Harrison, but refraining from telling the physician what procedures to perform on the claimant.

The claimant argues that the ALJ committed reversible error by not ensuring that Dr. Harrison, a consultative examining physician, x-rayed the claimant's hands. The court finds that the ALJ did not commit an error in failing to instruct a physician regarding what to do while examining the claimant. "An ALJ may not arrogate the power to act as both judge and physician." *Marbury v. Sullivan*, 957 F. 2d 837, 840-841 (11th Cir. 1991). The ALJ referred the claimant to Dr. Harrison in an effort to build evidence in the record. The job of an ALJ is to judge medical evidence, not decide what procedures doctors should or should not perform on claimants. The court finds no error with the ALJ failing to instruct Dr. Harrison on how to perform his examination.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the Commissioner applied the proper legal standards and that substantial evidence supports her decision. Therefore, the court finds that her decision is to be AFFIRMED.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 18th day of December, 2013.


_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE